

1  Michael London
2  Douglas & London, P.C.
   111 John Street
3  Suite 1400
   New York, NY 10038
4  Attorneys for Plaintiffs

5

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8

9  RAYMON B. LAWRENCE                     )  CV Docket No. 08      1172
                                          )
10                    Plaintiffs,         )
                                          )  **CIVIL COMPLAINT**
11       vs.                              )
                                          )
12                                        )  **JURY TRIAL DEMANDED**   CRB
13  PFIZER, INC.,                         )
                      Defendants.         )
14                                        )
                                          )
15                                        )

16      Plaintiff, RAYMON B. LAWRENCE, by and through his counsel, bring this action against

17  Defendants PFIZER, INC., (hereinafter collectively "Defendants") and allege as follows:

18                        **I.    PARTIES**

19      1.      This is an action for damages arising from Defendants' design, manufacture, sale,

20  testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib,

21  trade name BEXTRA® ("BEXTRA").

22      2.      Plaintiff RAYMON B. LAWRENCE was at all relevant times an adult resident citizen

23  of the State of Missouri. Plaintiff RAYMON B. LAWRENCE began ingesting Bextra on or about

24  June 2002. As a direct and proximate result of ingesting BEXTRA, Plaintiff suffered severe

25  cardiovascular injuries while ingesting Bextra, including, but not limited to, Stroke on or about March

26  16, 2003, which has caused and will continue to cause Plaintiff damages and places Plaintiff at risk of

27  further serious injury or death.

28      3.      Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of

_____

                        COMPLAINT

                            1

business in New York, New York. In 2003, Pfizer acquired Pharmacia Corporation for nearly $60 billion. At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA in California and nationwide.

## II.    JURISDICTION AND VENUE

4.    This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

5.    There is complete diversity of citizenship between the Plaintiff and Defendants. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because there is complete diversity of citizenship between Plaintiff and Defendants.

6.    Venue is proper in this United States Judicial District pursuant to 28 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in the district, thereby receiving substantial financial benefit and profits the dangerous product in this district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper and because of paragraph 8, below.

7.    At all relevant times herein, Defendants were in the business of designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and selling their product, BEXTRA. Defendants at all times relevant hereto designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce (including California and Louisiana) the aforementioned prescription drug. Defendants do substantial business in the State of California and within this Federal Judicial District, advertise in this district, receive substantial compensation and profits from sales of BEXTRA in this District, and made material omissions and misrepresentations and breaches of warranties in this District so as to subject them to *in personam* jurisdiction in this District. In engaging in the conduct alleged herein each defendant acted as the agent for each of the other defendants, or those defendant's predecessors in interest.

1

### III.    INTERDISTRICT ASSIGNMENT

2     8.    Assignment to the San Francisco Division is proper as this action is related to *In Re:*

3  *Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to the Honorable

4  Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6, 2005.

5  ///

6

### IV.    FACTUAL BACKGROUND

7  **A.    Facts Regarding Plaintiff**

8     9.    Plaintiff and Plaintiffs' healthcare providers were at the time of Plaintiff's injuries

9  unaware - and could not have reasonably known or have learned through reasonable diligence - that

10  such injury directly resulted from Defendants' negligent and otherwise culpable acts, omissions, and

11  misrepresentations or from Plaintiffs' ingestion of BEXTRA.

12     10.    Plaintiff used BEXTRA in a proper and reasonably foreseeable manner and used it in a

13  condition that was substantially the same as the condition in which it was manufactured and sold.

14     11.    Plaintiff would not have used BEXTRA had Defendants properly disclosed the risks

15  associated with the drug.

16  **B.    Facts Regarding Bextra and Bextra's Market Launch**

17     12.    Bextra is one of a class of pain medications called non-steroidal anti-inflammatory

18  drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are

19  examples of well-known NSAIDs.

20     13.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes

21  called cyclo-oxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2.

22  Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

23     14.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1

24  enzymes are involved in the production of gastric mucus; this protects the stomach wall from the

25  hydrochloric acid present in the stomach. It is generally accepted in the medical community that by

26  blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result,

27  can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

28     15.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting

---

COMPLAINT

3

1  platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation

2  of vascular smooth muscle.  Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2,

3  the COX-2 inhibitors leave Thromboxane A2 unaffected.  Thromboxane A2 is a potent platelet

4  aggregator and vasoconstrictor, which is synthesized by platelets.  Therefore, while the older NSAIDS

5  suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

6      16.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by

7  inhibiting both COX-1 and COX-2 enzymes simultaneously.  As would be expected, traditional

8  NSAIDs may cause ulcers in the stomach.  However, traditional NSAIDs do not cause blood clots,

9  rather they actually reduce the risk of clots and help protect heart function.

10     17.    Defendants and other pharmaceutical companies set out to remedy these ulcer and

11  bleeding problems suffered by some NSAID users by developing "selective" inhibitors that would

12  block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue

13  while still reducing inflammation.

14     18.    In making this decision, Defendants and their predecessors in interest either

15  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2

16  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood

17  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,

18  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

19     19.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in early

20  1999 and initiated a massive marketing campaign to convince doctors and consumers of the superiority

21  of their new "blockbuster" drug over less inexpensive NSAIDs.  In May 1999, Merck & Co., Inc.

22  ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

23     20.    Seeking increased market share in this extremely lucrative market, Defendants, and

24  their predecessors in interest, also sought approval of a "second generation" selective COX-2 inhibitor

25  and filed for FDA approval of Bextra on January 16, 2001 for the (i) prevention and treatment of acute

26  pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and symptoms of

27  osteoarthritis and adult rheumatoid arthritis.

28     21.    The FDA granted approval of the new drug on November 16, 2001, for two particular

---

COMPLAINT

4

1    uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms of osteoarthritis
2    and rheumatoid arthritis.

3       22.    The FDA did not grant approval to market and promote Bextra for the management or
4    prevention of acute pain.

5       23.    The FDA did not grant approval to promote Bextra as more effective than other
6    NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or gastric
7    bleeding.

8       24.    Even without a label that allowed Defendants to legitimately claim superior safety,
9    when Defendants, and their predecessors-in-interest, began marketing Bextra in early 2002,
10   Defendants and their representatives and agents misrepresented the safety profile of Bextra to
11   consumers, including Plaintiff, the medical community, healthcare providers, and third party payers.

12      25.    Defendants proceeded to promote, market, sell, and distribute Bextra as a much safer
13   and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

14   C.    **Facts Regarding Bextra's Safety and Defendants' Knowledge Thereof.**

15      26.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to
16   Defendants long before the FDA granted market approval in November 2, 2001. By 1997, and prior to
17   the submission of the New Drug Application (the "NDA") for Bextra, Defendants was aware that, by
18   inhibiting COX-2, Bextra altered the homeostatic balance between prostacylcin synthesis and
19   thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to
20   form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated with*
21   *Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954. Although all COX-2 inhibitors have this
22   mechanism of action, Bextra was the most selective COX-2 inhibitor proposed for approval.
23   Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

24      27.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported
25   in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that it was
26   known as early as 1999 that selective COX-2 inhibitors, such as Bextra, suppressed the formation of
27   prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose
28   patients to myocardial infarction or thrombotic stroke.

COMPLAINT

5

1    28.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the FDA for

2    Bextra, omitting information about the extent of the risks associated with Bextra. Without a complete

3    picture of the potential hazards associated with the drug, the FDA approved Bextra on or about

4    November 16, 2001.

5    29.    Based on the studies performed on Celebrex, Vioxx, Bextra, and other COX-2

6    inhibitors, and basic research on this type of selective inhibitor which had been widely conducted,

7    Defendants knew when Bextra was being developed and tested that selective COX-2 inhibitors posed

8    serious cardiovascular risks for anyone who took them, and presented a specific additional threat to

9    anyone with existing heart disease or cardiovascular risk factors. Studies show that selective COX-2

10   inhibitors, including Bextra, decrease blood levels of a prostacyclin. When those levels fall, the

11   arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

12   30.    On December 9, 2004, the FDA issued new information on side effects associated with

13   the use of Bextra and required the addition of certain warnings to, and the strengthening of other

14   warnings on, the Bextra label. The enhanced warnings followed in the wake of the results of

15   additional cardiovascular studies performed by Defendants, as well as numerous complaints to the

16   FDA regarding severe skin reactions.

17   31.    Yet well prior to this warning, Defendants had knowledge of the coronary and

18   cardiovascular safety risks of Bextra from several studies. *See e.g.*, Otto, E.O., *Efficacy and Safety of*

19   *the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing Coronary Artery*

20   *Bypass Surgery, The Journal of Thoracic and Cardiovascular Surgery*, June 2003 at 1481.

21   32.    Even Defendants' own (and Pfizer funded) post- drug approval meta-analysis study

22   (first presented on March 31, 2003 and again on May 15, 2003) included this data showing an

23   increased cardiovascular risk in patients treated with Bextra after undergoing coronary artery bypass

24   graft surgery. Observed events included heart attack, stroke, and blood clots in the legs and lungs.

25   The results were particularly relevant and striking as each of the study participants who were a post-

26   bypass surgery patient was ingesting anti-clotting agents at the time their exposure to Bextra was being

27   tracked.

28   33.    In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania found

---

COMPLAINT

6

1   that in patients having heart bypass surgery, those who took Bextra in the intravenous form, parecoxib,

2   as opposed to a placebo, were three times more likely to have a heart attack or stroke.

3       34.     From February 16-18, 2005, the FDA's Drug Safety and Risk Management Advisory

4   Committee and the Arthritis Drug Advisory Committee met jointly to further examine the safety of

5   COX-2 inhibitors. There, FDA Office of Drug Safety Officer David Graham testified that selective

6   COX-2 inhibitors increase the risk for adverse cardiovascular events at about the same rate as cigarette

7   smoking, hypertension, and diabetes.

8       35.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new

9   studies specifically analyzing the risks of Bextra, Defendants failed to take any action to protect the

10  health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's

11  Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee

12  meetings.

13      36.     On April 7, 2005, the FDA finally insisted that Defendants "voluntarily withdraw"

14  Bextra from the U.S. market, stating:

15              ". . . the Agency has concluded that the overall risk versus
                benefit profile of Bextra is unfavorable. This conclusion is based on the
16              potential increased risk for serious cardiovascular (CV) adverse events,
                which appears to be a class effect of non-steroidal anti-inflammatory
17              drugs (NSAIDs) (excluding aspirin), an increased risk of serious skin
                reactions (e.g. toxic epidermal necrolysis, Stevens-Johnson syndrome,
18              erythema multiforme) compared to other NSAIDs, and the fact that
                Bextra has not been shown to offer any unique advantage over the other
19              available NSAIDs."

20      37.     FDA Alert for Healthcare Professionals, April 7, 2005.

21  Continuing, the FDA noted:

22              "Bextra has been demonstrated to be associated with an
                increased risk of serious adverse CV events in two short-term trials in
23              patients immediately post-operative from coronary artery bypass graft
                (CABG) surgery . . . . FDA has concluded that it is reasonable to
24              extrapolate the adverse CV risk information for Bextra from the short-
                term CABG trials to chronic use given the fact that other COX-2
25              selective NSAIDs have been shown in long-term controlled clinical
                trials to be associated with an increased risk of serious adverse CV
26              events (e.g., death, MI, stroke), and the well described risk of serious,
                and often life-threatening gastrointestinal bleeding . . . . To date, there
27              have been no studies that demonstrate an advantage of Bextra over other
                NSAIDs that might offset the concern about the[] serous skin risks, such
28              as studies that show a GI safety benefit, better efficacy compared to

                                            COMPLAINT

                                                7

1
2

other products, or efficacy in a setting of patients who are refractory to
treatment with other products."

3
4
5
6

38.    The scientific data available during and after Bextra's approval process made clear to
Defendants that their formulation of Bextra would cause a higher risk of blood clots, stroke and/or
myocardial infarctions among Bextra consumers, alerting them to the need to do additional and
adequate safety studies.

7
8
9
10
11
12

39.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*,
outlining Defendants' failure to have conducted the necessary trials before marketing to humans
" . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2
inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease,
who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further
cardiovascular events."

13
14
15

40.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed
above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2
inhibitors.

16
17
18
19
20
21

41.    Based upon readily available scientific data, Defendants knew, or should have known,
that their pre-approval testing of Bextra did not adequately represent the cross-section of individuals
who were intended consumers and therefore, likely to take Bextra. Therefore, Defendants' testing and
studies were grossly inadequate. *See, e.g.*, PDR entry for Bextra (noting that: "**Platelets**: In four
clinical studies with young and elderly (>/=65 years) subjects, single and multiple doses up to 7 day
mg BID had no effect on platelet aggregation").

22
23
24
25
26
27
28

42.    Had Defendants done adequate testing prior to approval and "market launch," rather
than the extremely short duration studies done on the small size patient base that was actually done)
Pharmacia and Searle's scientific data would have revealed significant increases in incidence of
strokes and myocardial infarctions among the intended and targeted population of Bextra consumers.
Adequate testing would have shown that Bextra possessed serious side effects for individuals such as
Plaintiff. Defendants should have taken appropriate measures to ensure that their defectively designed
product would not be placed in the stream of commerce and/or should have provided full and proper

COMPLAINT

8

1    warnings accurately and fully reflecting the scope and severity of symptoms of those side effects
2    should have been made.

3    43.    In fact, post-market approval data did reveal increased risks of clotting, stroke and
4    myocardial infarction, but this information was intentionally suppressed by Defendants in order for
5    them to gain significant profits from continued Bextra sales.

6    44.    Defendants' failure to conduct adequate testing and/or additional testing prior to
7    "market launch" was based upon their desire to generate maximum financial gains for themselves and
8    to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

9    45.    At the time Defendants manufactured, advertised, and distributed Bextra to consumers,
10   Defendants intentionally or recklessly ignored and/or withheld information regarding the increased
11   risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such
12   increased risks were disclosed, consumers such as Plaintiffs would not purchase Bextra, but instead
13   would purchase other cheaper and safer NSAIDs.

14   **D.    Facts Regarding Defendants' Marketing and Sale of Bextra**

15   46.    Plaintiffs and at all times relevant herein, Defendants engaged in a marketing campaign
16   with the intent that consumers would perceive Bextra as a safer and better drug than its other NSAIDs
17   and, therefore, purchase Bextra.

18   47.    Defendants widely and successfully marketed Bextra throughout the United States by,
19   among other things, conducting promotional campaigns that misrepresented the efficacy of Bextra in
20   order to induce a widespread use and consumption.  Bextra was represented to aid the pain and
21   discomfort of arthritis, osteoarthritis, and related problems.  Defendants made misrepresentations by
22   means of media advertisements, and statements contained in sales literature provided to Plaintiff's
23   prescribing physicians.

24   48.    Despite knowledge of the dangers presented by Bextra, Defendants and Defendants'
25   predecessors in interest, through their officers, directors and managing agents for the purpose of
26   increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known
27   defects of Defendants' product, Bextra, and failed to warn the public, including Plaintiff, of the serious
28   risk of injury occasioned by the defects inherent in Defendants' product, Bextra.  Defendants and their

1  officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the

2  manufacturing, sale and marketing of Defendants' product, Bextra, knowing that persons would be

3  exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants'

4  conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and

5  particularly of Plaintiff.

6      49.    In an elaborate and sophisticated manner, Defendants aggressively marketed Bextra

7  directly to consumers and medical professionals (including physicians and leading medical scholars) in

8  order to leverage pressure on third party payers, medical care organizations, and large institutional

9  buyers (*e.g.*, hospitals) to include Bextra on their formularies. Faced with the increased demand for

10  the drug by consumers and health care professionals that resulted from Defendants' successful

11  advertising and marketing blitz, third party payers were compelled to add Bextra to their formularies.

12  Defendants' marketing campaign specifically targeted third party payers, physicians, and consumers,

13  and was designed to convince them of both the therapeutic and economic value of Bextra.

14      50.    Defendants represented that Bextra was similar to ibuprofen and naproxen but was

15  superior because it lacked any of the common gastrointestinal adverse side effects associated with

16  these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in

17  certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use.

18  Defendants promoted Bextra as a safe and effective alternative that would not have the same

19  deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain

20  relief.

21      51.    Bextra possessed dangerous and concealed or undisclosed side effects, including the

22  increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting,

23  deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Bextra

24  was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs,

25  carried a risk of perforations, ulcers, and gastrointestinal bleeding. Defendants chose not to warn

26  about these risks and dangers.

27      52.    Defendants knew of these risks before the U.S. Food and Drug Administration (the

28  "FDA") approved Bextra for sale on November 16, 2001, but Defendants ignored, downplayed,

suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Bextra. Defendants' omission, suppression, and concealment of this important information enabled Bextra to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

53.     Consequently, Bextra captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002), sales of Bextra exceeded $1.5 billion, despite the significantly higher cost of Bextra as compared to other pain relievers in the same family of drugs.

54.     It was not until April 7, 2005, that Defendants finally acknowledged Bextra's deleterious side effects and announced that they were withdrawing the drug from the worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking Bextra to an increased risk of heart attacks and strokes.

55.     Had Defendants done adequate testing prior to approval and "market launch," Pharmacia's scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of BEXTRA consumers. Adequate testing would have shown that BEXTRA possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

56.     In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued BEXTRA sales.

57.     Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

58.     At the time Defendants manufactured, advertising, and distributed BEXTRA to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if

1    such increased risks were disclosed, consumers such as Plaintiffs would not purchase BEXTRA, but

2    instead would purchase other cheaper and safer NSAID drugs.

3        59.    At all times relevant herein, Defendants engaged in a marketing campaign with the

4    intent that consumers, including plaintiff, and their doctors would perceive BEXTRA as a better drug

5    than its competitors and, therefore, purchase BEXTRA.

6        60.    Defendants widely and successfully marketed BEXTRA throughout the United States

7    by, among other things, conducting promotional campaigns that misrepresented the efficacy of

8    BEXTRA in order to induce a widespread use and consumption.  BEXTRA was represented to aid the

9    pain and discomfort of arthritis, osteoarthritis, and related problems.  Defendants made

10   misrepresentations by means of media advertisements, and statements contained in sales literature

11   provided to Plaintiff's prescribing physicians.

12       61.    Prior to manufacturing, sale and distribution of BEXTRA, Defendants, through their

13   officers, director and managing agents, had notice and knowledge from several sources, that BEXTRA

14   presented substantial and unreasonable risks of harm to the consumer.  As such, BEXTRA consumers,

15   including Plaintiff, were unreasonably subject to risk of injury or death from the consumption of

16   Defendants' product, BEXTRA.

17       62.    Despite such knowledge, Defendants and Defendants' predecessors in interest, through

18   their officers, directors and managing agents for the purpose of increasing sales and enhancing its

19   profits, knowingly and deliberately failed to remedy the known defects of Defendants' product,

20   BEXTRA, and failed to warn the public, including Plaintiffs, of the serious risk of injury occasioned

21   by the defects inherent in Defendants' product, BEXTRA.  Defendants and their officers, agents and

22   managers intentionally proceeded with the inadequate testing, and then the manufacturing, sale and

23   marketing of Defendants' product, BEXTRA, knowing that persons would be exposed to serious

24   potential danger, in order to advance their own pecuniary interests.  Defendants' conduct was wanton

25   and willful, and displayed a conscious disregard for the safety of the public and particularly of

26   Plaintiff.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Negligence

63.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows.

64.    Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling BEXTRA.  This duty included the duty not to introduce a pharmaceutical drug, such as BEXTRA, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

65.    At all relevant times to this action, Defendants owed a duty to properly warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug BEXTRA.

66.    Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of BEXTRA, including: failing to use due care in the preparation and development of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

a.    failing to use due care in the design of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

b.    failing to conduct adequate pre-clinical testing and research to determine the safety of BEXTRA;

c.    failing to conduct adequate post-marketing surveillance and exposure studies to determine the safety of BEXTRA;

d.    failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiffs, consumers, the medical community, and the FDA;

e.    failing to accompany BEXTRA with proper warnings regarding all possible adverse side effects associated with the use of BEXTRA;

f.    failing to use due care in the manufacture, inspection, and labeling of BEXTRA

---

COMPLAINT

13

1    to prevent the aforementioned risk of injuries to individuals who used BEXTRA;

2         g.    failing to use due care in the promotion of BEXTRA to prevent the

3    aforementioned risk of injuries to individuals when the drugs were ingested;

4         h.    failing to use due care in the sale and marketing of BEXTRA to prevent the

5    aforementioned risk of injuries to individuals when the drugs were ingested;

6         i.    failing to use due care in the selling of BEXTRA to prevent the aforementioned

7    risk of injuries to individuals when the drugs were ingested;

8         j.    failing to provide adequate and accurate training and information to the sales

9    representatives who sold BEXTRA;

10         k.    failing to provide adequate and accurate training and information to healthcare

11    providers for the appropriate use of BEXTRA; and

12         l.    being otherwise reckless, careless and/or negligent.

13    67.    Despite the fact that Defendants knew or should have known that BEXTRA caused

14    unreasonable and dangerous side effects which many users would be unable to remedy by any means,

15    Defendants continued to promote and market BEXTRA to consumers, including Plaintiff, when safer

16    and more effective methods of pain relief were available.

17    68.    Defendants were, or should have been, had they exercised reasonable care, in

18    possession of evidence demonstrating that BEXTRA caused serious side effects. Nevertheless, they

19    continued to market their products by providing false and misleading information with regard to the

20    safety and efficacy of BEXTRA.

21    69.    Defendants knew or should have known that consumers such as Plaintiff would

22    foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

23    70.    As a direct and proximate consequence of Defendants' acts, omissions, and

24    misrepresentations described herein, Plaintiff sustained serious injuries and related losses. Plaintiff

25    required and will continue to require healthcare and services. Plaintiff have incurred and will

26    continue to incur medical and related expenses. Plaintiff also have suffered and will continue to suffer

27    mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a

28    diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and

activation of latent conditions, and other losses and damages. Plaintiff also incurred direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiffs have also suffered loss of wages.

71.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

72.    WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Strict Liability

73.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows.

74.    At all times relevant to this action, Defendants were suppliers of BEXTRA, placing the drug into the stream of commerce. BEXTRA was expected to and did reach Plaintiffs without substantial change in the condition in which it was manufactured and sold.

75.    BEXTRA was unsafe for normal or reasonably anticipated use.

76.    BEXTRA was defective in design or formulation because when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect. BEXTRA was also defective and unreasonably dangerous in that the foreseeable risk of injuries from BEXTRA exceeded the benefits associated with the design and/or formulation of the product.

77.    Bextra is unreasonably dangerous: a) in construction or composition as provided in R.S. 9:2800.55; b) in design as provided in R.S. 9:2800.56; c) because an adequate warning about the product was not provided as required by R.S. 9:2800.57; d) because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

78.    The characteristics of Bextra that render it unreasonably dangerous under R.S.

9:2800.55, et seq., existed at the time the product left the control of the manufacturer or resulted from a reasonably anticipated alteration or modification of the product.

79.    The BEXTRA manufactured and supplied by Defendants was also defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of the clinical trials, testing and study. Defendants failed to perform adequate testing before exposing Plaintiffs to the medication, testing which would have shown that BEXTRA had the potential to cause serious side effects including strokes like that which affected Plaintiffs.

80.    The BEXTRA manufactured and supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of injuries from BEXTRA, they failed to provide adequate warnings to the medical community and the consumers, to whom they were directly marketing and advertising BEXTRA; and, further, it continued to affirmatively promote BEXTRA as safe and effective.

81.    BEXTRA was manufactured, distributed, tested, sold, marketed, advertised and promoted defectively by Defendants, and as a direct and proximate cause of Defendants' defective design of BEXTRA, Plaintiff used BEXTRA rather than other safer and cheaper NSAIDs. As a result, Plaintiff suffered the personal injuries described above.

82.    Information given by Defendants to the medical community and to the consumers concerning the safety and efficacy of BEXTRA, especially the information contained in the advertising and promotional materials, did not accurately reflect the potential side effects of BEXTRA.

83.    Had adequate warnings and instructions been provided, Plaintiff would not have taken BEXTRA as they did, and would not have been at risk of the harmful side effects described herein.

84.    Defendants acted with conscious and deliberate disregard of the foreseeable harm caused by BEXTRA.

85.    Plaintiff could not, through the exercise of reasonable care, have discovered BEXTRA's defects or perceived the dangers posed by the drug.

86.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, Plaintiff sustained serious injuries and related losses. Plaintiff required and will continue to require healthcare and services. Plaintiff have incurred and will continue

1  to incur medical and related expenses. Plaintiff also have suffered and will continue to suffer mental

2  anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished

3  quality of life, increased risk of premature death, aggravation of preexisting conditions and activation

4  of latent conditions, and other losses and damages. Plaintiff also incurred direct medical losses and

5  costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

6  Plaintiffs have also suffered loss of wages.

7       87.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and

8  deliberate disregard for the value of human life and the rights and safety of consumers, including

9  Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and

10  deter them from similar conduct in the future.

11       88.    WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory

12  damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys'

13  fees and such other and further relief as this Court deems just and proper.

14                        **THIRD CLAIM FOR RELIEF**

15                         **Breach of Express Warranty**

16       89.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully

17  set forth herein and further allege as follows.

18       90.    Defendants expressly represented to Plaintiff and other consumers and the medical

19  community that BEXTRA was safe and fit for its intended purposes, that it was of merchantable

20  quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects,

21  and that it was adequately tested.

22       91.    These warranties came in the form of:

23            a.    Defendants' public written and verbal assurances of the safety and efficacy of

24  BEXTRA;

25            b.    Press releases, interviews and dissemination via the media of promotional

26  information, the sole purpose of which was to create an increased demand for BEXTRA, which failed

27  to warn of the risk of injuries inherent to the ingestion of BEXTRA, especially to the long-term

28  ingestion of BEXTRA;

1    c.    Verbal and written assurances made by Defendants regarding BEXTRA and
2    downplaying the risk of injuries associated with the drug;

3    d.    False and misleading written information, supplied by Defendants, and
4    published in the Physician's Desk Reference on an annual basis, upon which physicians relied in
5    prescribing BEXTRA during the period of Plaintiffs' ingestion of BEXTRA, and;

6    e.    advertisements.

7    92.    The documents referred to above were created by and at the direction of Defendants.

8    93.    Defendants knew or had reason to know that BEXTRA did not conform to these
9    express representations in that BEXTRA is neither as safe nor as effective as represented, and that
10    BEXTRA produces serious adverse side effects.

11    94.    BEXTRA did not and does not conform to Defendants' express representations because
12    it is not safe, has numerous and serious side effects, including unwarned-of side effects, and causes
13    severe and permanent injuries.

14    95.    Plaintiff, other consumers, and the medical community relied upon Defendants' express
15    warranties.

16    96.    As a direct and proximate consequence of Defendants' acts, omissions, and
17    misrepresentations described herein, Plaintiff sustained serious injuries and related losses. Plaintiffs
18    required and will continue to require healthcare and services. Plaintiff have incurred and will continue
19    to incur medical and related expenses. Plaintiff also have suffered and will continue to suffer mental
20    anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished
21    quality of life, increased risk of premature death, aggravation of preexisting conditions and activation
22    of latent conditions, and other losses and damages. Plaintiff also incurred direct medical losses and
23    costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.
24    Plaintiff have also suffered loss of wages.

25    97.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and
26    deliberate disregard for the value of human life and the rights and safety of consumers, including
27    Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and
28    deter them from similar conduct in the future.

98.    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### Breach of Implied Warranty

99.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows.

100.    Defendants manufactured, distributed, advertised, promoted, and sold BEXTRA.

101.    At all relevant times, Defendants knew of the use for which BEXTRA was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

102.    Defendants were aware that consumers, including Plaintiffs, would use BEXTRA for treatment of pain and inflammation and for other purposes.

103.    Plaintiff and the medical community reasonably relied upon Defendants' judgment and expertise to only sell them or allow them to prescribe BEXTRA only if it was indeed of merchantable quality and safe and fit for its intended use. Consumers, including Plaintiff, and the medical community, reasonably relied upon Defendants' implied warranty for BEXTRA.

104.    BEXTRA reached consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendants.

105.    Defendants breached their implied warranty to consumers, including Plaintiff; BEXTRA was not of merchantable quality or safe and fit for its intended use.

106.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, Plaintiff sustained serious injuries and related losses. Plaintiffs required and will continue to require healthcare and services. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff also incurred direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

1 | Plaintiff have also suffered loss of wages.

2 |     107.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and

3 | deliberate disregard for the value of human life and the rights and safety of consumers, including

4 | Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and

5 | deter them from similar conduct in the future.

6 |     108.    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory

7 | damages and punitive and exemplary damages together with interest, the costs of suit and attorneys'

8 | fees, and such other and further relief as this Court deems just and proper.

9 | ### FIFTH CLAIM FOR RELIEF

10 | ### Fraudulent Misrepresentation & Concealment

11 |     109.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully

12 | set forth herein and further allege as follows.

13 |     110.    Defendants' superior knowledge and expertise, their relationship of trust and

14 | confidence with doctors and the public, their specific knowledge regarding the risks and dangers of

15 | BEXTRA, and their intentional dissemination of promotional and marketing information about

16 | BEXTRA for the purpose of maximizing its sales, each gave rise to the affirmative duty to

17 | meaningfully disclose and provide all material information about BEXTRA's risks and harms to

18 | doctors and consumers.

19 |     111.    Defendants made fraudulent affirmative misrepresentations with respect to BEXTRA in

20 | the following particulars:

21 |         a.    Defendants represented through their labeling, advertising, marketing materials,

22 | detail persons, seminar presentations, publications, notice letters, and regulatory submissions that

23 | BEXTRA had been tested and found to be safe and effective for the treatment of pain and

24 | inflammation; and

25 |         b.    Defendants represented that BEXTRA was safer than other alternative

26 | medications.

27 |     112.    Defendants made affirmative misrepresentations; and fraudulently, intentionally and/or

28 | recklessly concealed material adverse information regarding the safety and effectiveness of BEXTRA.

1    113.    Defendants made these misrepresentations and actively concealed adverse information

2    at a time when Defendants knew or had reason to know that BEXTRA had defects and was

3    unreasonably dangerous and was not what Defendants had represented to the medical community, the

4    FDA and the consuming public, including Plaintiff.

5    114.    Defendants omitted, suppressed and/or concealed material facts concerning the dangers

6    and risk of injuries associated with the use of BEXTRA including, but not limited to, the

7    cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants' purpose was

8    willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of

9    the risks associated with the use of BEXTRA in order to increase its sales.

10    115.    The representations and concealment were undertaken by Defendants with an intent

11    that doctors and patients, including Plaintiff, rely upon them.

12    116.    Defendants' representations and concealments were undertaken with the intent of

13    defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and

14    encourage the sale of BEXTRA.

15    117.    Defendants' fraudulent representations evinced their callous, reckless, willful, and

16    depraved indifference to the health, safety, and welfare of consumers, including Plaintiffs.

17    118.    Plaintiff's physician and Plaintiff relied on and were induced by Defendants'

18    misrepresentations, omissions, and/or active concealment of the dangers of BEXTRA in selecting

19    BEXTRA treatment.

20    119.    Plaintiffs and the treating medical community did not know that the representations

21    were false and were justified in relying upon Defendants' representations.

22    120.    Had Plaintiff been aware of the increased risk of side effects associated with BEXTRA

23    and the relative efficacy of BEXTRA compared with other readily available medications, Plaintiffs

24    would not have taken BEXTRA as he did.

25    121.    As a direct and proximate consequence of Defendants' acts, omissions, and

26    misrepresentations described herein, Plaintiff sustained serious injuries and related losses. Plaintiff

27    required and will continue to require healthcare and services. Plaintiff has incurred and will continue

28    to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer mental

anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished

quality of life, increased risk of premature death, aggravation of preexisting conditions and activation

of latent conditions, and other losses and damages. Plaintiff also incurred direct medical losses and

costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

Plaintiffs have also suffered loss of wages.

122.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and

deliberate disregard for the value of human life and the rights and safety of consumers, including

Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and

deter them from similar conduct in the future.

123.    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory

damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys'

fees, and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

124.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully

set forth herein and further allege as follows.

125.    At all times relevant to this action, Defendants were the manufacturers, sellers, and/or

suppliers of BEXTRA.

126.    Plaintiff paid for BEXTRA for the purpose of managing their pain safely and

effectively.

127.    Defendants have accepted payment from Plaintiff for the purchase of BEXTRA.

128.    Plaintiff did not receive the safe and effective pharmaceutical product for which she

paid.

129.    It is inequitable and unjust for Defendants to retain this money because Plaintiff did not

in fact receive the product Defendant represented BEXTRA to be.

130.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks equitable

relief, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just

and proper.

1

2
## **PRAYER FOR RELIEF**

3
WHEREFORE, Plaintiff requests the following relief:

4
1.    General damages in excess of the jurisdictional amount of this Court;

5
2.    Consequential damages;

6
3.    Disgorgement of profits;

7
4.    Restitution;

8
5.    Damages for loss of consortium, care, comfort, society and companionship in an

9
amount within the jurisdiction of this Court and according to proof;

10
6.    Punitive and exemplary damages;

11
7.    Pre-judgment and post-judgment interest as provided by law;

12
8.    Recovery of Plaintiff's costs including, but not limited to, discretionary Court costs of

13
these causes, and those costs available under the law, as well as expert fees and attorneys' fees and

14
expenses, and costs of this action; and

15
9.    Such other and further relief as the Court deems just and proper.

16
Dated: February 25, 2008

17

18
**DOUGLAS & LONDON, P.C.**

19

20
By:  _____
Michael London

21
Attorneys for Plaintiff

22
## **DEMAND FOR JURY TRIAL**

23
Plaintiffs demand a trial by jury on all claims so triable in this action.

24

25
Dated: February 25, 2008

26

27
By:  _____
Michael London

28
Attorneys for Plaintiff

---

COMPLAINT

STATE OF NEW YORK    )
                            ss.:
COUNTY OF NEW YORK   )

Michael A. London, being duly sworn, deposes and says:

That deponent is the attorney for the plaintiff(s) in the action within; that deponent has read the foregoing  and knows the contents thereof; that the same is true to deponent's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true and the reason that this verification is not made by plaintiff(s) and is made by deponent is that plaintiff(s) is/are not presently in the county where the attorneys for the plaintiff(s) have their office.

Deponent further says that the source of deponent's information and the grounds of deponent's belief as to all matters not stated upon deponent's knowledge are from investigations made on behalf of said plaintiff(s).

_____
MICHAEL A. LONDON

Sworn to before me this
February 2008.

_____
Notary Public

JOHN K. COYLE
Notary Public, State of New York
No. 01CO5046090
Qualified in Queens County
Commission Expires July 3,

COMPLAINT

1

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS

RAYMON B. LAWRENCE

**DEFENDANTS**

PFIZER, INC.

**CRB**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Oregon County

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

MICHAEL LONDON; DOUGLAS AND LONDON, 111 JOHN STREET; STE. 1400; NY, NY 10038

ATTORNEYS (IF KNOWN)

**ADR**

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☑ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF

(For diversity cases only)                    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ Original
Proceeding

☐ Removed from
State Court

☐ Remanded from
Appellate Court

☐ Reinstated or
Reopened

☐ Transfered from
Another district
(specify)

☑ Multidistrict
Litigation

☐ Appeal to District
Judge from Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 382 Personal Injury | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure of | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☑ 365 Personal Injury | Property 21 USC 881 | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 RR & Truck | | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers | Injury Product Liability | ☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | ☐ 370 Other Fraud | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| Student Loans (Excl | ☐ 345 Marine Product | ☐ 371 Truth in Lending | ☐ 690 Other | | Exchange |
| Veterans) | Liability | ☐ 380 Other Personal | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | Property Damage | **LABOR** | | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | ☐ 385 Property Damage | | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders Suits | Product Liability | Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate | ☐ 791 Empl.Ret. Inc. Security | | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence Habeas Corpus: | Act | ☐ 870 Taxes (US Plaintiff or | Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 530 General | | Defendant | Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | 26 USC 7609 | Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/ disab - Empl | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | ☐ 446 Amer w/ disab - Other | ☐ 555 Prison Condition | | | |
| | ☐ 480 Consumer Credit | | | | |
| | ☐ 490 Cable/Satellite TV | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC 1332 DIVERSITY CLAIM FOR INJURIES RESULTING FROM BETRA

## VII. REQUESTED IN COMPLAINT:  ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $____ ☐ CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23  10 Mil. per cause of action
+ punitives
JURY DEMAND: ☑ YES ☐ NO

## VIII. RELATED CASE(S)    PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
IF ANY                    "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)    ☑ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE  **2/25/08**    SIGNATURE OF ATTORNEY OF RECORD

JS 44 Page 2
(Rev. 11/04)

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.  (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a). F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.  Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.  Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.  Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.  Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Date and Attorney Signature.

Date and Attorney Signature.  Date and sign the civil cover sheet.